Cite as 2025 Ark. App. 533

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. E-25-31

| | |
|---|---|
| ARKANSAS DEPARTMENT OF HUMAN SERVICES<br><br>                  APPELLANT<br><br><br>V.<br><br><br>DIRECTOR, DIVISION OF WORKFORCE SERVICES; AND BRENT GASPER<br><br>                  APPELLEES | Opinion Delivered November 5, 2025<br><br><br>APPEAL FROM THE ARKANSAS BOARD OF REVIEW<br>[NO. 2024-BR-01117]<br><br><br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Appellant Arkansas Department of Human Services ("DHS") appeals the January 31, 2025 decision of the Arkansas Board of Review (the "Board") finding that appellee Brent Gasper ("Gasper") was discharged from last work for reasons other than misconduct in connection with the work and that Gasper is entitled to benefits under Arkansas Code Annotated section 11-10-514(b) (Supp. 2025). DHS challenges the sufficiency of the evidence supporting the Board's finding that Gasper's conduct was not a willful disregard of the interests of DHS. We affirm the Board's decision.

### I. *Facts and Procedural History*

Gasper was employed as assistant deputy chief counsel for DHS, and his job description required, among other things, a license to practice law in Arkansas, more than

ten years of litigation experience, and more than five years of experience with administrative appeals. Gasper was subject to DHS Policy 1084(II)(A), which provides, "Job Performance: employees are expected to perform all of their job duties in a diligent and competent manner, to work in a cooperative manner with their co-employees and supervisors, to maintain reliable and timely attendance, and to produce high quality work product." *See* https://humanservices.arkansas.gov/wp-content/uploads/DHS-Policy-1084.pdf. DHS Policy 1084(II)(C), in relevant part, states, "Professionalism: employees are expected to perform their jobs in a professional and courteous manner. . . . Employees must be alert to avoid even the appearance of misconduct, personal or financial gain, or conflict of interest." *Id.*

Vincent France ("France") was hired as deputy chief counsel of DHS on November 13, 2023. On December 12, Jamie Ward ("Ward"), a nurse who coordinates DHS's administrative appeals, sent France an email about Gasper. Ward notified France that Gasper had emailed an administrative law judge, his clients, and several other people about a hearing scheduled for 1:00 p.m. that day, informing them that he did not have a hearing packet or witness information. The referenced email from Gasper was sent at 10:48 a.m. and stated, "Hello, this hearing is set for 1:00 today. I do not see where I've received a hearing packet or spoken to the witness. Can someone contact me and send along the packet?" Gasper had been assigned the case on October 20, 2023.

The email raised concerns for France because Gasper had known about the hearing and witnesses for a month and a half, and this seemed to be evidence of a lack of diligence

2

and preparation. Further, France was concerned that Gasper's copying the administrative law judge on the email indicating he was not prepared for the hearing reflected poorly on DHS.

France also learned of an August 16, 2023 email to Gasper from the executive director of the Arkansas State Claims Commission ("Claims Commission"). That email also raised concerns because it indicated that Gasper had not initially filed a formal answer in a proceeding. Considering that Gasper was the most experienced attorney in his department at DHS, France felt that his failure to submit a formal answer to the Claims Commission likewise showed a lack of diligence and professionalism.

After France received the email from Ward and discussed it with his superiors, he emailed Gasper on December 14 regarding his concerns:

> You are directed to respond by the end of business today to some issues regarding your work performance.
>
> Issue 1: Why did you not act with more diligence and professionalism when on December 12, 2023, at 10:48 a.m., the day of the hearing, you sent an email in which you stated the following: "Hello, this hearing is set for l:00 [p.m.] today. I do not see where I've received a hearing packet or spoken to the witness. Can someone contact me and send along the packet." Moreover, not only did you send this email to your client, but also you included Judge Wayne Davis, the ALJ, on the email. Additionally, your email was sent using a prior email thread in which you were informed on October 20, 2023, that the hearing was scheduled for Tuesday, December 12, 2023. Then, in the same email chain, on December 4, 2023, you were informed that your original witness was no longer available, and you were given the name and contact information for your new witness.
>
> Issue 2: Explain your actions and why on August 16, 2023, you sent an email to the Claims Commission instead of filing a formal answer regarding the claim of *Centers for Youth v. DHS*, despite the fact that the rules for the Claims Commission require that a responsive pleading be filed. Rule 2.2.

3

Again, you are to provide me with your written responses by no later than the close of business today. Lastly, given the nature of these issues, I would like to meet with you in person tomorrow. Thus, you need to work at the office tomorrow.

Gasper responded to France's inquiry the same day:

Issue #1

This involves the case involving the pro se litigant/client William Burks, who was seeking a review of a denial for personal care services.

The nature of the administrative hearing process used as I was taught is viewed more as a cooperative measure between all parties as opposed to an adversarial one. You'll note in these cases that the client and the ALJ are oftentimes included on the same communications from the very outset of the scheduled hearing. It is not at all unusual for an ALJ to be involved in coordinating with our witnesses or staff directly, or communicating directly, to obtain the necessary case files, witness information, or other documentation. I can point to dozens of instances where this occurs and I'm sure other attorneys in the division can do so as well. Moreover, it is and has been as I was instructed the responsibility of the agency client to deliver the complete hearing packet to the ALJ as well as to the OCC attorney. They are supposed to do so prior to the hearing but sometimes this does not occur, due to oversight, staff changes, vacations, or any other number of reasons that one encounters in an extremely large agency. Further, this is the nature of things given the large number of hearings that are continuously set for the very near future. The situation occurring on December 12 is not notable in any regard and happens from time to time. The witness was eventually contacted two hours prior to the hearing[,] and the hearing was conducted under ordinary circumstances.

As for prior knowledge of the hearing date, I, like all the other attorneys, try to keep my calendar as up to date as possible. It is oftentimes the case that one doesn't see a hearing is set for the near future until it is very near in time. At that time the case is addressed[,] and the hearing is held under normal circumstances. There is no lag in either diligence or professionalism. Hearing dates and times get rescheduled, continued, or simply dismissed *all the time*[,] and no calendar is ever fully set in stone.

I would also note that the email I sent starting with "Hello . . . " did not have the prior email chain to which you reference. A copy is attached.

It is the nature of this work in this division of OCC that hearing prep sometimes does not occur until the last minute for minor cases, such as Mr. Burks. It is also the nature of this work in this division of OCC that a complete hearing packet is not always fully prepared or transmitted to either OCC or the ALJ beforehand. Many times[,] the hearing packet is not sent to the ALJ until the day of the hearing for minor cases, such as with Mr. Burks. OCC relies on other DHS staff to compile and prepare the hearing packet. In more involved or more important cases (or when there is an opposing counsel) this is usually *not* the case and a full hearing prep is conducted beforehand[,] and evidence is procured in a timely manner. But a case such as Mr. Burks, which involved a pro se litigant, one witness (that I consulted with several hours before the hearing), and an ALJ familiar with our administrative hearing process is much more the norm that the outlier.

As to whether I was diligent or professional in what transpired on December 12, I fully stand behind my actions and contend I was diligent and professional under the attendant circumstances.

Issue #2

The email on August 16, 2023, to Kathryn Irby was an *inquiry* into the nature of the response required of the Claims Commission. Given that the Claims Commission sometimes permits emails to be considered responsive pleadings or documents, I did not see it as inappropriate to ask whether this would be permitted in that particular case since there were already a number of cases involving Centers for Family and Youth that involved the same issue and same counsel. As evidenced by an email received back from Kathryn Irby, attached, she indicated that an email answer would be permitted and accepted if I so chose to do so, while expressing a preference that a formal answer be filed. Based on her response, I filed a formal Answer, which was still not due for approximately two (2) weeks.

As for abiding by the rules, I would note that Rute 2.2 was not broken. Indeed, it was followed. Moreover, Rule 1.2 of the Rules provides for a "liberal construction" of the rules themselves, which is oftentimes the case when simple cases are involved in the Claims Commission. I can provide a number of communications between me and Kathryn Irby, as well as with opposing counsel, in several cases where formal filings were bypassed in lieu of informal filings. Given its quasi-judicial status[,] I've found that Ms. Irby, and by extension the Commission, finds it more expeditious to conduct Commission business informally instead of using the pleading process.

France initially planned to issue Gasper a written warning, wanting Gasper to acknowledge his failure to act diligently. Instead, France felt that Gasper blamed everyone

but himself in his response. France interpreted Gasper's response to mean Gasper intended to continue to do things his way without the required diligence. France found that Gasper's response contained inaccurate statements, and he was most upset by Gasper's attitude that the December 12 hearing was not important because the case involved a pro se litigant. France took Gasper's response to be insubordinate because Gasper stated that he was not going to change.

After receiving Gasper's response and discussing it with his chain of command, France decided that Gasper should be terminated. That termination occurred on December 15 pursuant to the following termination letter:

> This letter is to inform you that your employment with DHS is terminated effective immediately pursuant to DHS Policy 1084 for failure to meet the job performance standards (Section II(A)), standards of professionalism (Section II(C)), and for failure to comply with the Arkansas Rules of Professional Conduct, including but not limited to Rule 1.3 of the Arkansas Rules of Professional Conduct, which states that "[a] lawyer shall act with reasonable diligence and promptness in responding to a client."

> On December 14, 2023, I sent you an email inquiring about your actions taken and lack of diligence you showed on December 12, 2023, in which you sent an email stating the following: "Hello, this hearing is set for 1:00 [p.m.] today. I do not see where I've received a hearing packet or spoken to the witness. Can someone contact me and send along the packet." You hand-delivered me your response to my inquiry on the afternoon of December 14, 2023.

> After receiving your response, the decision has been made to terminate your employment for the reasons explained below. First, even when your lack of diligence was questioned, your response showed a lack of diligence. Specifically, the emails you provided with your response contradict statements in your response. Second, in your response, you failed to take ownership and responsibility as the attorney assigned to the matter. By your response to my inquiry and your emails, you had not begun to prepare for the hearing until two hours before the hearing, despite that fact that you had been assigned to the case since October 20, 2023. As the attorney assigned to the

hearing, you had an obligation to obtain the packet earlier than two hours before the hearing. Lastly from my inquiry, this specific example from December 12, 2023, appears to be one example of multiple others.

France maintained that Gasper acted with willful and wanton disregard or carelessness or negligence to such a degree or recurrence as to manifest a wrongful intent or evil design.

Gasper filed an application for unemployment benefits with the Arkansas Division of Workforce Services ("Agency"). His claim was initially denied, with the notice of agency determination stating, "The claimant was discharged from their job on 12/15/2023 due to their negligence in performing their job duties. This was within the claimant's control. The claimant's actions were against the employer's best interest."

Gasper filed a timely appeal from the agency determination to the Arkansas Appeal Tribunal (the "Tribunal"). The Tribunal held a hearing on November 20, 2024, at which France and DHS Chief Human Resources Officer Damien Hicks testified. Gasper did not testify at the hearing or rebut any of France's testimony. The Tribunal upheld the Agency's determination that Gasper was not entitled to unemployment benefits because he was terminated for misconduct in connection with the work as defined by Arkansas Code Annotated section 11-10-514(a)(4)(B) (Supp. 2023). The Tribunal found that Gasper "was not merely inefficient or had unsatisfactory conduct or failed in good performance as a result of inability or incapacity because the claimant is a seasoned attorney." The Tribunal stated that Gasper's response to France's inquiry was "intentionally in defiance, and it demonstrated a willful disregard of the employer's interest."

Gasper then filed a petition for review to the Board pursuant to Arkansas Code Annotated section 11-10-525 (Repl. 2012). Following a review without accepting new evidence, the Board reversed the Tribunal and granted benefits to Gasper. In its January 31, 2025 decision, the Board determined that the proof before it was insufficient to find that Gasper committed misconduct as defined by Arkansas Code Annotated section 11-10-514(a)(4)(B), which states repeated acts of commission, omission, or negligence despite progressive discipline constitute sufficient proof of intentional poor performance; and the Board specifically made the following determination:

> In this case, there does not appear to have been any prior progressive discipline. While not required for a discharge for misconduct, misconduct cannot be found under the provisions Arkansas Code Annotated section 11-10-514(a)(4)(B), which apply to repeated acts of commission, omission, or negligence despite progressive discipline. In this case, the claimant was likely behaving in a manner that he had done throughout his time with the employer. The testimony indicated that the claimant was one of the more senior litigators, if not the most senior litigator in his department. France had warned his attorneys that they may have to change the way they do things but was not specific as to what needed changing. The claimant's response to France's inquiry was defensive. However, it does not seem particularly insubordinate or signal a refusal to change if requested to do so. It appears that the claimant was negligent to a certain degree regarding the December 12, 2023 case. He should have noticed the upcoming hearing sooner. He was fortunate that the witness was available for hearing, and he should have acknowledged that he made a mistake. The employer may have a good reason to discharge him for his negligence and nonchalant attitude toward certain types of cases. However, the employer has not shown by a preponderance of evidence that his conduct was a willful disregard of the employer's interests or otherwise rose to such a level as to amount to misconduct. Therefore, he was discharged from last work for reasons other than misconduct. The decision of the Tribunal is reversed.

DHS timely appealed the decision, and this appeal followed.

## II. *Standard of Review and Applicable Law*

8

In *Arkansas Family Supports, Inc. v. Director*, we set forth the standard of review and law applicable to unemployment cases involving section 11-10-514 as follows:

> Our standard of review in unemployment-insurance cases is well settled. We do not conduct de novo reviews in appeals from the Board. Instead, we review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings of fact. We accept the Board's findings of fact as conclusive if supported by substantial evidence, which is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Even when there is evidence on which the Board might have reached a different decision, our scope of judicial review is limited to a determination of whether the Board could have reasonably reached the decision rendered based on the evidence presented. We defer credibility calls to the Board as the finder of fact as well as the weight to be accorded to testimony presented to the Board.
>
> Arkansas Code Annotated section 11-10-514(a)(1) provides that "an individual shall be disqualified from receiving unemployment benefits if he or she is discharged from his or her last work for misconduct in connection with the work." Misconduct in connection with the work includes the violation of any behavioral policies of the employer, as distinguished from deficiencies in meeting production standards or accomplishing job duties. Ark. Code Ann. § 11-10-514(a)(3)(A). This includes, without limitation, disregard of an established bona fide written rule known to the employee or a willful disregard of the employer's interest. Ark. Code Ann. § 11-10-514(a)(3)(B)(i)–(ii).
>
> Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion do not rise to the level of misconduct. There must be an intentional or deliberate violation, a willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design. It is the employer's burden to establish misconduct by a preponderance of the evidence. Whether an employee's behavior is misconduct that justifies the denial of unemployment benefits is a question of fact for the Board to decide.

2025 Ark. App. 380, at 4–6, 717 S.W.3d 563, 566.

Employees fired for misconduct cannot receive unemployment benefits if their conduct meets the definition of misconduct found in Arkansas Code Annotated section 11-10-514(a), which provides in part:

> (3)(A) Misconduct in connection with the work includes violation of any behavioral policies of the employer as distinguished from deficiencies in meeting production standards or accomplishing job duties; and

> (B) Without limitation:

> (i) Disregard of an established bona fide written rule known to the employee; or

> (ii) A willful disregard of the employer's interest.

If the termination is based on job performance, then the employee's conduct must be intentional. Ark. Code Ann. § 11-10-514(a)(4)(A). Sufficient proof of that intention is shown by repeated poor performance despite progressive discipline. Ark. Code Ann. § 11-10-514(a)(4)( B); *see also Bright v. Dir.*, 2021 Ark. App. 217, at 3, 625 S.3d 720, 722.

### III. *Discussion*

DHS submits that the Board's decision awarding Gasper unemployment benefits is not supported by substantial evidence. DHS claims that the unrebutted testimony at the hearing before the Tribunal established that Gasper intentionally failed to meet the job-performance standards, standards of professionalism, and that he failed to comply with Rule 1.3 the Arkansas Rules of Professional Conduct (2024).

If a claimant is disqualified from receiving unemployment benefits because the claimant is terminated for misconduct in connection with the work, *see Dillinger v. Director*, 2020 Ark. App. 138, at 3, 596 S.W.3d 62, 65, the employer has the burden of establishing

10

misconduct by a preponderance of the evidence. *Id.* "For unemployment-insurance purposes, the definition of misconduct requires more than mere inefficiency, unsatisfactory conduct, failure in good performance as a result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion." *Weinstein v. Dir.*, 2013 Ark. App. 374, at 6, 428 S.W.3d 560, 564. Moreover, "[a]n element of intent is also required: mere good-faith errors in judgment or discretion and unsatisfactory conduct are not misconduct unless of such a degree or recurrence as to manifest culpability, wrongful intent, evil design, or intentional disregard of an employer's interest." *Id.* The determination of misconduct turns on whether the acts were willful. *See Terravista Landscape v. Williams*, 88 Ark. App. 57, 66, 194 S.W.3d 800, 806 (2004).

DHS notes that in *Terravista*, this court reversed the Board's finding that an employee was not discharged for misconduct where the evidence established that the employee's repeated shortcomings were a violation of written policy. And in *Weinstein*, an attorney's failure to submit satisfactory briefs, follow routing procedures, and properly edit a document were found to amount to misconduct.

DHS submits that the undisputed evidence established that DHS policy does not require progressive discipline before terminating an employee. And DHS points out that France's uncontested testimony was that it is in DHS's interest to have its attorneys adequately prepare for hearings. France testified that it is not in DHS's best interest for its attorneys to communicate to judges that the attorneys are not adequately prepared for a

11

hearing and that the uncontested evidence established that Gasper was untruthful in his response to France's inquiry.

DHS cites its Policy 1084(II)(A), which requires employees to perform their job duties in a diligent and competent manner. DHS Policy 1084(II)(C) requires DHS employees to comply with job-related standards and requirements, which includes the Arkansas Rules of Professional Conduct for attorneys. Rule 1.3 of the Arkansas Rules of Professional Conduct states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Comment 3 to Rule 1.3 states, in part, "[e]ven when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness." Ark. R. Prof'l Conduct 1.3 cmt. 3. Accordingly, DHS argues that no reasonable mind could accept the uncontested evidence as adequate to support the Board's conclusion that Gasper was discharged for reasons other than misconduct. It concludes that the Board's decision to award Gasper unemployment benefits should be reversed because the uncontested evidence established that Gasper knowingly failed to diligently handle his cases.

We disagree and reiterate that misconduct requires more than poor job performance. *See Ark. Fam. Supports, Inc. supra*. Inefficiency, unsatisfactory conduct, inadvertencies, or ordinary negligence in isolated instances, including good faith errors in judgment or discretion, do not constitute misconduct as defined by the statute. *Clark v. Dir.*, 83 Ark. App. 308, 312, 126 S.W.3d 728, 730 (2003). The proof must show an intentional or deliberate violation, a willful or wanton disregard of the employer's interest, or carelessness or

12

negligence of such degree or recurrence as to manifest wrongful intent or evil design. *Keith v. Dir.*, 2018 Ark. App. 541, at 2, 564 S.W.3d 296, 297; *Follet v. Dir.*, 2017 Ark. App. 505, at 3, 530 S.W.3d 884, 886. Whether an employee's behavior is misconduct that justifies the denial of unemployment benefits is a question of fact for the Board to decide. *Rockin J Ranch, LLC v. Dir.*, 2015 Ark. App. 465, at 2, 469 S.W.3d 368, 370.

The question before us is not whether DHS was justified in terminating Gasper but whether his conduct disqualified him from receiving employment benefits. *See Dillinger*, 2020 Ark. App. 138, at 3, 596 S.W.3d at 65. Because DHS specifically alleged that Gasper was fired for misconduct for failing to meet job-performance standards, DHS was required to prove intent. *See Terravista*, *supra*.

It is undisputed that Gasper's termination was related to his job performance. The record supports that there had been no allegations that Gasper violated any behavioral policies such as attendance, misuse of leave, or insubordination. DHS presented no proof of any job counseling, performance-improvement plans, prior discipline related to Gasper's job performance, or written case-management standards that Gasper had violated. According to Gasper's letter of termination, he was "terminated for failure to meet job performance standards" and for violating Arkansas Rule of Professional Conduct 1.3. Yet the termination letter recited only one instance related to his handling of a hearing and one situation in which he sent an email rather than a formal answer—concerns that related to job performance rather than conduct.

France acknowledged in his testimony that during his month working at DHS at the time of Gasper's termination, he had observed Gasper's job performance and thought he had done a very good job. During the hearing, France admitted that he could not cite another instance of alleged misconduct before the December 12 hearing at issue and the pleading issue in the Claims Commission matter. During questioning by Gasper, France testified that he could not remember whether he had attended the December 12 hearing with Gasper but acquiesced that he might have. After Gasper reiterated that France had been present at that hearing, France acknowledged that he could not say if the outcome was favorable to DHS. The record indicates that it was favorable: the petitioner withdrew his petition in the middle of the hearing because he had filed it in the wrong place.

The relevant statute requires proof that the claimant intentionally sought to hurt his employer's interests. The Board found that Gasper's standing by his work performance does not prove that he wanted to hurt his employer. DHS offered no evidence that Gasper's alleged poor performance adversely affected DHS—the agency was successful at the hearing in question, and DHS did not contest its liability for payment in the matter before the Claims Commission that was the focus of the second issue in the email and termination letter. DHS likewise offered no evidence that it was subjected to any adverse findings, punitive sanctions, or other penalties because of Gasper's performance.

The record supports the fact that France had not communicated work expectations to the DHS attorneys other than to tell them that just because things had been done a certain way in the past did not mean that it would suffice going forward. France himself referred to

14

Gasper's actions as "mistakes" in his testimony and acknowledged that he considered termination based only on his reaction to Gasper's written response to his concerns set out in the December 12 email.

DHS essentially asks this court to reweigh the evidence in its favor. But we have stated that where arguments essentially consist of a request for this court to reweigh the evidence, we will decline to do so. *See Ark. Fam. Supports, Inc.*, 2025 Ark. App. 380, at 8, 717 S.W.3d at 567. Under these specific facts and the absence of evidence of ill intent, we agree that the record supports the Board's determination that DHS failed to prove its allegations of misconduct, which would have disqualified Gasper from receiving unemployment benefits. Accordingly, we affirm the Board's decision.

Affirmed.

HIXSON and MURPHY, JJ., agree.

*Tim Griffin*, Att'y Gen., by: *Carl F. "Trey" Cooper III*, Sr. Ass't Att'y Gen., for appellant.

*Cynthia L. Uhrynowycz*, for appellee.